UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHANIE ALICE MCGARRAH,

    Plaintiff,

v.

NANCY A BERRYHILL,

    Defendant.

Case No.  17-cv-03092-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 21

Plaintiff Stephanie A. McGarrah moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found McGarrah not disabled and therefore denied her application for benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 et seq.  [Docket No. 20.]  The Commissioner cross-moves to affirm.  [Docket No. 21.]  For the reasons stated below, the court grants McGarrah's motion in part, denies the Commissioner's cross-motion, and remands this case for further proceedings.

I.      **PROCEDURAL HISTORY**

McGarrah filed applications for Title II and Title XVI benefits on July 30, 2013, which were initially denied on November 25, 2013 and again on reconsideration on February 5, 2014. Administrative Record ("A.R.") 201-212, 118-122, 129-133.  On March 13, 2014, McGarrah filed a request for a hearing before an Administrative Law Judge (ALJ).  A.R. 140-142.  ALJ Nancy Lisewski held a hearing on August 17, 2015.  A.R. 41-72.

After the hearing, the ALJ Lisewski issued a decision finding McGarrah not disabled. A.R. 17-31.  The ALJ determined that Plaintiff has the following severe impairments: major depressive disorder; generalized anxiety disorder; panic disorder with agoraphobia; posttraumatic stress disorder ("PTSD"); "cluster B and C traits"; borderline intellectual functioning; alcohol

United States District Court
Northern District of California

abuse; marijuana abuse; and obesity.  A.R. 22.  The ALJ found that McGarrah retains the

following residual functional capacity (RFC):

> [C]laimant has the residual functional capacity to perform light work
> as defined in 20 CFR [§§] 404.1567(b) and 416.967(b) except with
> the following limitations: perform simple, routine non-public work
> with no more than occasional contact with co-workers and
> supervisors.  Occasionally is defined as occurring from very little up
> to one-third of the time, or approximately 2 hours in an 8-hour
> workday.

A.R. 24.  Relying on the opinion of a vocational expert (VE) who testified that an individual with

such an RFC could perform other jobs existing in the economy, including night cleaner and

laundry sorter, the ALJ concluded that McGarrah is not disabled.  A.R. 30-31.

The Appeals Council denied McGarrah's request for review on March 30, 2017.  A.R. 1-4.

The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of

Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).  McGarrah then filed suit in this court

pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable

physical or mental impairment that prevents her from engaging in substantial gainful activity[1]  and

that is expected to result in death or to last for a continuous period of at least twelve months.

*Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The

impairment must render the claimant incapable of performing the work she previously performed

and incapable of performing any other substantial gainful employment that exists in the national

economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20

C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

1.     At the first step, the ALJ considers the claimant's work activity, if any.  If the

claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.     At the second step, the ALJ considers the medical severity of the claimant's

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.      At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.      At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    McGarrah's Medical History

McGarrah, who was 31 years old on the date of the hearing, was first diagnosed with depression at age 13 and prescribed antidepressant medication.  A.R. 455, 457, 476.  She experienced two psychiatric holds for suicidal ideation in October 2009 and June 2010.  A.R. 380-392, 499-517.  In October 2009, she was hospitalized after a neighbor reported loud crying coming from McGarrah's apartment, and she was found "crying uncontrollably and hitting herself in the face, very upset."  A.R. 389-392.  She reported being "afraid to seek help because of lack of medical insurance."  A.R. 389.  In June 2010, she was hospitalized for threatening suicide.  The police found McGarrah "fully clothed in the shower, crying [and] very despondent" after her brother called to report that she had threatened to kill herself by overdosing on medications.  A.R.

381-388.

**B.    August 2015 Hearing**

### 1. McGarrah's Testimony

McGarrah testified that she lives with her partner and roommates.  Her partner takes care of her and she receives food stamps.  A.R. 45-46, 201.  She last worked six to ten years ago, and testified that she is unable to work due to "psychological symptoms that have been going on for awhile."  A.R. 46.  McGarrah finished high school and took some college classes.  A.R. 48.  Her last long-term job was working at a music store as a sales associate and in its warehouse.  A.R. 48. She was fired from that position for coming in late too many times, and lost at least two other jobs due to coming in late.  A.R. 49-50.

McGarrah testified that she has used drugs and alcohol, and that she drinks "maybe a couple times a week."  A.R. 46-47.  She acknowledged having reported binge drinking to medical providers, stating, "I have a problem with alcohol," and that "in certain situations just keep drinking . . . it's kind of a like a self-destructive kind of drinking."  A.R. 47.  McGarrah testified that she drinks excessively when she is "really depressed, anxious and there's alcohol around," and that such drinking happens about once a month.  A.R. 47.  She testified that she has a medical marijuana card and uses marijuana each day to relieve her anxiety.  A.R. 47-48.

McGarrah sees a therapist for a couple of hours once a week and sees a psychiatrist about once every three weeks.  A.R. 51.  She has been prescribed Ativan and Effexor by her psychiatrist. A.R. 51.  She stopped taking Lexapro and Wellbutrin due to side effects.  A.R. 51-52.  She testified that she is currently depressed and feels depressed every day, and that she has lost interest in "any . . . kind of entertainment" and socializing and interacting with others.  A.R. 52-53.  She has "steadily gain[ed] weight" and has difficulty sleeping, on average sleeping five or six hours per night.  A.R. 53-54.  She is 5'4" and weighs 220 pounds.  A.R. 46.  Her energy levels are "nonexistent" on a daily basis; she testified that she is lethargic and spends most of her time in bed.  A.R. 54.  McGarrah experiences feelings of guilt or worthlessness "daily," particularly when thinking about not being able to take care of her son, who is 11 or 12 years old.  A.R. 54, 59.  She lost custody of him when he was a baby and cannot remember the year he was born.  A.R. 59.

McGarrah described her poor concentration; she testified that she likes to read but has difficulty focusing for more than five minutes.  A.R. 54.  McGarrah has difficulty remembering things if she does not write them down.  A.R. 57-58.  She "freak[s] out" if she misplaces things.  A.R. 58.

McGarrah first started having thoughts of suicide in junior high school and has such thoughts every day.  A.R. 53, 55.  She also self-harms by cutting, burning, and punching herself, smashing her head on walls or tables, pulling her hair out, and picking at her skin until it bleeds.  A.R. 55.  She feels anxious every day, and experiences symptoms including skin picking, chest pains, shortness of breath, sweating, shaking, and sobbing.  A.R. 55.  She has a constant feeling "like I'm just going to die."  She also experiences violent panic attacks about two times per week during which she becomes incoherent and worries about hurting her partner.  A.R. 55-56.

Over the years McGarrah has become "more and more reclusive" and it has become more difficult to get out of bed or walk outside.  A.R. 56.  She goes outside on her own "a couple times a week."  A.R. 57.  She occasionally visits her grandparents, with whom she used to live, but "make[s] it really short" and doesn't "get along with anyone in [her] family."  A.R. 57.  She does not talk on the phone.  A.R. 57.

McGarrah described a typical day as, "I wake up, wish I was dead."  After she gets up she prepares cereal and returns to bed to eat and take her medicine.  She "just kind of lay[s] around in bed until [her] partner gets home."  A.R. 58.  If she is feeling really depressed, she will not "take care of [her]self," including not brushing her hair and not showering.  Her partner often has to help her get out of bed and pull out clothes for her to wear.  A.R. 58.  She shops and cooks with her partner.  A.R. 58-59.  Household chores like folding clothes can take her all day to do.  A.R. 59.

### 2.  Matthew Henderson's Testimony

McGarrah's partner, Matthew Henderson, testified at the hearing.  He has been McGarrah's partner for four and a half years and as of the date of the hearing had been living with McGarrah for a month and a half.  A.R. 60.  He testified that McGarrah drinks on average two beers once or twice per week, and that she uses marijuana "daily" to "curb her anxiety."  A.R. 61.

Henderson testified that he did not believe that McGarrah is able to work due to the

5

1   periods of anxiety and depression that "keep her in bed, or lead to severe panic attacks" and would

2   not be "conducive to a work environment." A.R. 61.  He testified that McGarrah consistently

3   takes medication for her conditions.  A.R. 62.

4       He described her symptoms of depression as difficulty concentrating, difficulty in and

5   avoidance of social situations, and difficulty getting out of bed.  A.R. 62.  He testified that she has

6   difficulty falling and staying asleep and problems with nightmares and sleep paralysis.  A.R. 62.

7   Henderson testified that McGarrah has problems concentrating, including difficulty reading and

8   trouble following recipes.  A.R. 62-63.

9       Henderson testified that he has seen McGarrah punch herself in the face; choke herself

10  with her hands, a cord, or an article of clothing; and bash her head into walls and car windows.  He

11  has also "seen the immediate aftermath of her cutting herself on the arms."  A.R. 63.  As to her

12  panic attacks, Henderson testified that they "come on sort of abruptly," and that she experiences

13  chest pains and difficulty breathing.  A.R. 63.  Those episodes often lead to her punching herself

14  and bashing her head into walls and last from 10 to 20 minutes.  She usually spends "half a day

15  trying to recover from" the panic attacks, which she experiences about once a week.  A.R. 63-64.

16  According to Henderson, McGarrah has "an issue . . . with losing things," which causes a lot of

17  her panic attacks.  A.R. 65.

18      Henderson testified that McGarrah is overwhelmed by being around others.  She is also

19  overwhelmed by "[t]he logistics of public transportation," so he estimated that "90 percent of the

20  time she leaves the house it's with [Henderson]."  A.R. 64.

21      **C.**    **Relevant Medical Evidence**

22        **1.**    **Treating Physicians**

23          **a.**    **Patricia Jones and Lesleigh Franklin, Ph.D.**

24      Patricia Jones, Marriage and Family Therapist Intern ("MFTI"), completed a mental

25  impairment questionnaire on July 20, 2015, supervised by Lesleigh Franklin, Ph.D.  A.R. 653-657.

26  Jones noted that she had had weekly 50-minute sessions with McGarrah, A.R. 653, and the record

27  contains Jones's therapy notes for McGarrah for the time period September 2014 through March

28  2015.  *See* A.R. 570-592.

United States District Court
Northern District of California

In the questionnaire, Jones noted McGarrah's diagnoses of major depressive disorder and generalized anxiety. She wrote that McGarrah is not a malingerer and that her conditions were expected to last at least 12 months. A.R. 653. She opined that McGarrah's impairments would cause her to be absent from work more than four days per month. A.R. 653.

Jones opined that McGarrah is extremely impaired in the following areas: ability to maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; and deal with normal work stress. A.R. 654. She also opined that McGarrah has marked impairments in several areas, including her ability to remember work-like procedures, maintain attention for two-hour segments, and make simple work-related decisions. A.R. 654.

Jones indicated that McGarrah reported experiencing anxiety attacks at least two to three times per week "where she cries, becomes nervous and fearful and cannot function." She also wrote that McGarrah "has anxiety on her way to her therapy appointments and she spends half of her sessions in tears." A.R. 656. Jones wrote:

> Ms. McGarrah struggles to get out of bed without the motivation of a friend. She came to all appointments with an escort and still cried the entire way to the apt. When she tried to come to an appointment on her own, she had a "meltdown" at the Bart station. By "meltdown," Mc. McGarrah is describing an anxiety attack. Her heart races, she becomes nervous, agitated, and fearful.

A.R. 657.

### b.      Amrit Saini, M.D. and Clifton Der Bing, Psy.D.

McGarrah received treatment from Amrit Saini, M.D., a psychiatrist, and Clifton Der Bing, Psy.D, a psychologist, at the Hume Center from April 6, 2015 through September 16, 2015. A.R. 735-813. Drs. Saini and Der Bing completed a mental impairment questionnaire on July 27, 2015. A.R. 658-662.

Drs. Saini and Der Bing noted that they had treated McGarrah every two weeks since April 6, 2015. They noted her diagnoses of major depressive disorder and panic disorder, rule out bipolar disorder. A.R. 658. They described the following clinical findings that demonstrate the

severity of McGarrah's mental impairment and symptoms: low grooming and hygiene; poor eye contact; incoherent speech; passive cooperation; anxious, depressed, and irritable mood; psychomotor retardation; and recurring suicidal ideation. A.R. 658. They indicated that her condition was expected to last at least 12 months, that McGarrah is not a malingerer, and that her impairments are not caused by substance intoxication, dependence, or withdrawal. A.R. 658. They opined that McGarrah's impairments would cause her to be absent from work more than four days per month. A.R. 658.

Drs. Saini and Der Bing opined that McGarrah is extremely impaired in the following areas: sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. A.R. 650. They also opined that McGarrah has marked impairments in several areas, including her ability to remember work-like procedures, maintain attention for two-hour segments, and maintain regular attendance and be punctual within customary, usually strict tolerances. A.R. 660.

In response to a question asking for a description of "any additional reasons not covered above why your patient would have difficulty working at a regular job on a sustained basis," Drs. Saini and Der Bing wrote:

> Patient has history of emotional and physical trauma causing high resting anxiety and numbness. Trauma has caused hypervigilance and high emotional [illegible] with high social anxiety and intolerance. She has chronic insomnia and sleep apnea syndrome is being ruled out. Patient has recurring suicidal ideation.

A.R. 662.

### 2. Examining Physicians

#### a. Charles DeBattista, M.D.

Charles DeBattista, M.D., a psychiatrist, performed a consultative psychiatric evaluation on October 25, 2013. A.R. 418-425. Dr. DeBattista noted that McGarrah was the source of information for the evaluation, and that there were no accompanying psychiatric records to review.

A.R. 418. McGarrah's chief complaints were depression and anger. A.R. 418. McGarrah reported that her mood was depressed approximately 90% of the time, and complained of anhedonia, fatigue, and passive thoughts "that life is not worth living." A.R. 419. She also complained about insomnia, feeling hopeless and worthless, and concentration and memory problems. A.R. 419.

Dr. DeBattista noted that McGarrah reported binge drinking about once per week, drinking a 12-pack of beer plus hard liquor, and that she uses marijuana periodically. A.R. 419. McGarrah also reported that she has been arrested four times, including for arson and assault. A.R. 420.

Upon mental status examination, Dr. DeBattista noted that McGarrah was neatly groomed, cooperative, made good eye contact and had good interpersonal contact. She appeared genuine and truthful and her thought processes were coherent and organized. A.R. 420. Her thought content was relevant and non-delusional. Her mood was depressed and irritable, and her affect was agitated. Her speech was normal and she appeared to be of at least average intelligence. A.R. 421. Her memory, fund of knowledge, concentration and calculation were all normal. A.R. 421. McGarrah's insight and judgment appeared to be intact. A.R. 421.

Dr. DeBattista diagnosed alcohol abuse and depression not otherwise specified, and assessed a GAF score of 50. He concluded that her prognosis was "good," and that "[s]he would be expected to improve in the next 6-12 months with active treatment." A.R. 422. He opined that McGarrah could understand, remember, and carry out simple one- or two-step job instructions, and that she was moderately impaired in several areas, including her ability to maintain concentration and attention, persistence, and pace; associate with day-to-day work activity; accept instructions; and maintain regular attendance in the workplace. A.R. 422.

b.      Dionne Childs, M.S. and Lesleigh Franklin, Ph.D.

Dionne Childs, M.S., performed a consultative psychological evaluation on April 30, 2014. She was supervised by Dr. Lesleigh Franklin. A.R. 561-569.

Childs administered several tests, and McGarrah received a full scale IQ score of 79. A.R. 563. Her score on the M-FAST test, which is a measure used to determine if an individual is prone to overstate or exaggerate symptoms, indicated that she was not prone to overstate the

9

severity of her symptoms. A.R. 565. McGarrah reported symptoms including feeling

overwhelmed on a daily basis, depressed mood most of the day, loss of interest, weight

fluctuation, sleep disturbance, psychomotor agitation/retardation, fatigue, feelings of

worthlessness and guilt, poor concentration, and suicidality. A.R. 565-566. Childs and Dr.

Franklin diagnosed major depressive disorder, posttraumatic stress disorder, panic disorder, and

borderline intellectual functioning. A.R. 566.

According to Childs and Dr. Franklin, McGarrah is extremely limited in her ability to

respond appropriately to changes in a routine work setting and deal with normal work stressors.

A.R. 569. They also opined that McGarrah is markedly limited in her ability to understand,

remember, and carry out detailed instructions; maintain attention and concentration for two hour

segments; get along and work with others; accept instructions and respond appropriately to

criticism from supervisors; complete a normal workday and workweek; and maintain regular

attendance and be punctual. A.R. 569.

### c.    Katherine Wiebe, Ph.D.

Katherine Wiebe, Ph.D., performed a consultative psychological evaluation on July 23,

2015. A.R. 677-694. Dr. Wiebe interviewed McGarrah, reviewed her records, and administered

several tests. She noted that McGarrah "became homeless after being fired from her last job about

10 years ago," and since then had "stayed with her grandparents in Fremont, couch surfing, and

staying with people," until recently moving into an apartment in Berkeley with her partner and

roommates. A.R. 679. McGarrah reported that she had spent one week in jail for assaulting a

police officer in 2012, and had also spent time in jail for misdemeanor arson "when she was angry

and set a dumpster on fire during an Oscar Grant riot." A.R. 679.

Dr. Wiebe assessed McGarrah's pre-morbid IQ as "likely within the borderline range," and

found her overall functioning in attention, concentration, and persistence as severely impaired.

A.R. 682. She opined that McGarrah is mildly to moderately impaired in the area of executive

functioning. A.R. 682. McGarrah is severely impaired in her memory functioning, mildly

impaired in language, severely impaired in visual/spatial abilities, and mildly impaired in

sensory/motor abilities. A.R. 683.

Dr. Wiebe diagnosed McGarrah with major depressive disorder; panic disorder; posttraumatic stress disorder; schizoid personality disorder; alcohol use disorder, mild; and borderline intellectual functioning.  A.R. 690.  She opined that McGarrah is extremely impaired in her ability to respond appropriately to changes in a routine work setting and deal with normal work stressors.  She also opined that McGarrah is markedly impaired in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for two hour segments; get along and work with others; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and complete a normal workday and workweek without interruptions from psychologically based symptoms.  A.R. 694.

### 3.  State Agency Medical Consultants

P.M. Balson, M.D., reviewed McGarrah's records and assessed her mental RFC on November 15, 2013.  A.R. 74-83.  Dr. Balson opined that McGarrah is moderately limited in several areas, including her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  A.R. 80-81.  However, Dr. Balson concluded that McGarrah "can do unskilled ta[s]ks with no public contact" and "[m]inimal contact with other co-workers and supervisors."  A.R. 79.  On reconsideration, Margaret Pollack, Ph.D., reviewed the records and affirmed Dr. Balson's findings on February 3, 2014.  A.R. 97-104.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).

11

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     ISSUES PRESENTED

McGarrah argues that the ALJ erred in weighing the medical opinions and in assessing McGarrah's credibility. She argues that as a result of these errors, the ALJ erred in assessing McGarrah's RFC.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.    DISCUSSION

### A. Weighing of the Medical Opinions

The ALJ discussed the medical evidence and stated that she gave significant weight to the administrative findings of fact of the state agency medical physicians, and great weight to the opinion of examining physician Dr. DeBattista. A.R. 28. She stated that she gave little weight to the combined opinion of treating physicians Drs. Saini and Der Bing and the combined opinion of Dr. Franklin and MFTI Jones; little weight to the opinion of examining physician Dr. Weibe; and little weight to the combined opinion of Dr. Franklin and Childs, who examined McGarrah. A.R. 28-29.

McGarrah argues that the ALJ erred in giving little weight to the opinions of Drs. Saini, Der Bing, Franklin, Weibe, MFTI Jones, and Childs.

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the

doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the

13

record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Jones/Franklin, Saini/Der Bing, and Childs/Franklin Opinions

In April 2014, Childs, under the supervision of Dr. Franklin, performed a consultative psychological examination of McGarrah. She assessed a full scale IQ score of 79, and opined that McGarrah had a number of extreme and marked limitations with respect to her ability to do unskilled work. A.R. 563, 569. In July 2015, McGarrah's treating therapist, MFTI Jones, under the supervision of Dr. Franklin, concluded that McGarrah was extremely impaired in five areas, including her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. A.R. 654. Jones also found that McGarrah had marked impairments in several areas, including her ability to remember work-like procedures and make simple work-related decisions. A.R. 654. Later that month, two additional treating physicians, psychiatrist Dr. Saini and Dr. Der Bing, a psychologist, also concluded that McGarrah had extreme impairments in six areas, including her ability to complete a normal workday and workweek, and found she had marked impairments in a number of areas. A.R. 650-660.

The ALJ discussed these three opinions together and gave them little weight in favor of Dr. DeBattista's opinion and the opinions of the state agency medical consultants, who concluded that despite some moderate impairments, McGarrah could perform unskilled tasks with no public contact (Drs. Balson and Pollack) and understand, remember, and carry out simple one- or two-step job instructions (Dr. DeBattista). A.R. 79, 422. Given these contradictions, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject the opinions of Childs, Franklin, Jones, Saini, and Der Bing. *Lester*, 81 F.3d at 830.

The ALJ listed the following reasons in support of her decision to give the opinions of Childs, Franklin, Jones, Saini, and Der Bing little weight:

14

United States District Court
Northern District of California

[1] their opinions were based on the claimant's subjective reporting and the marked and extreme limitations, as set forth in the medical source statements are advocatory in nature, as they are not supported by the record; [2] the record does not document any episode of decompensation of at least two weeks duration; [3] Dr. Franklin did not examine the claimant during the April 2014 evaluation and the record lacks corresponding treatment notes; [4] the April 2014 evaluation noted that the results of the MMSE indicated no impairment; [5] as discussed above, Dr. DeBattista noted that the claimant had average intelligence and her education and work history are inconsistent with the diagnosis of borderline intellectual functioning; [6] alcohol abuse and marijuana use are not noted in the diagnostic impressions of the April 2014 evaluation; [7] prior mental health treatment notes demonstrate significantly improved functioning with mental health; and [8] the claimant's activities contradict these opinions.

A.R. 29. The manner in which the ALJ discounted the opinions at issue complicates the court's review of the ALJ's weighing of the medical opinions, because not all of the reasons offered to discount the opinions pertain to all three opinions discussed. Specifically, the reasons numbered 3, 4, 5, and 6 above pertain only to the Childs/Franklin opinion based on the April 2014 consultative psychological examination. Reasons 1, 2, 7, and 8 appear to pertain to all three opinions.

Upon review of the record, the court concludes that the ALJ erred with respect to these opinions and discusses each in turn.

### i. Jones/Franklin Opinion

The ALJ wrote that the Jones/Franklin opinion was based on McGarrah's subjective reporting, and that the marked and extreme limitations "are advocatory in nature, as they are not supported by the record." A.R. 29. It is inaccurate to suggest that the opinion was solely based on McGarrah's subjective reporting. While the opinion includes descriptions of McGarrah's own statements, the record reflects Jones's treatment relationship with McGarrah and contains Jones's treatment notes. Those notes reflect 11 therapy sessions with McGarrah from September 2014 through March 2015 at the East Bay Family Institute and ostensibly support Jones's July 2015 opinion. A.R. 570-592. The treatment notes reflect Jones's personal observations of McGarrah over that seven-month period, including frequent crying, blunted affect, depression, anxiety, difficulty with "considering new possibilities of thinking," and hopelessness. *See id.* Jones

15

discussed the same recurring issues with McGarrah during those sessions, including negative thoughts, anger, irritability, anxiety, sadness, social isolation, hopelessness, and irrational thinking. *See, e.g.*, A.R. 571, 573, 575, 577, 579.

Further, to the extent that the ALJ sought to imply that McGarrah's reporting to Jones about her symptoms was not credible, there is nothing in the Jones/Franklin opinion or Jones's treatment notes that suggests that Jones or Dr. Franklin viewed McGarrah as not credible. In fact, Jones and Dr. Franklin made findings in their opinion that McGarrah was not a malingerer. A.R. 653. Elsewhere in the ALJ's opinion, she noted the existence of examining and treating source opinions that support McGarrah's claim for benefits, but wrote "these opinions were based on the claimant's subjective reporting and numerous factors undermine the claimant's credibility concerning her reported symptoms and limitations." A.R. 27. She then discussed the facts that the record contained only "intermittent mental health treatment notes," that McGarrah had experienced improvement in 2012 and 2013 after she started therapy and psychotropic medication but then stopped following up with treatment and stopped taking prescribed medication in 2013, that there were inconsistencies in the record that indicated that McGarrah was an unreliable historian, and that McGarrah's activities indicated a higher level of functioning than she claimed. A.R. 27-28. While these reasons are connected to the ALJ's assessment of McGarrah's credibility, they are not sufficiently "specific and legitimate" to discount McGarrah's treating providers' opinions, since, as noted above, the Jones/Franklin opinion was based on a seven-month treating relationship, and not just McGarrah's own reporting.

The ALJ also concluded that the limitations found by Jones and Dr. Franklin were "advocatory in nature, as they are not supported by the record." A.R. 29. She did not otherwise explain this reason, and the court concludes that it is not a sufficiently "specific and legitimate reason" to assign less weight to the Jones/Franklin opinion. To the extent that the ALJ assigned less weight to the Jones/Franklin opinion because it was obtained by McGarrah rather than the Commissioner, the Ninth Circuit has cautioned that "[a]n examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." *Lester*, 81 F.3d at 832 ("The Secretary may not assume that doctors routinely lie

16

1    in order to help their patients collect disability benefits." (quotation omitted)). Moreover, the

2    Jones/Franklin opinion was not unsupported, in that it was entirely consistent with the opinions of

3    Drs. Saini and Der Bing and the limitations assessed by Childs and Dr. Franklin in 2014.

4          Next, the ALJ wrote that the record did not document any episode of decompensation of at

5    least two weeks duration. The ALJ did not provide any explanation of how this reason

6    undermined the Jones/Franklin opinion, and the court concludes that it is not a specific and

7    legitimate reason supported by substantial evidence to discount that opinion.

8          The ALJ offered two additional reasons to discount the Jones/Franklin opinion. She wrote

9    that "prior mental health treatment notes demonstrate significantly improved functioning with

10   mental health" and that McGarrah's activities contradicted the opinion. A.R. 29. Again, the ALJ

11   did not cite any evidence in particular to support these reasons. However, elsewhere in her

12   opinion, the ALJ discussed McGarrah's improvement with psychotropic medication and

13   counseling, followed by a treatment gap after February 2013. A.R. 26. Treatment notes from

14   November 2012 show that McGarrah was prescribed hydroxyzine and later reported that the

15   medication improved her panic/anxiety, although she still had some symptoms of depression and

16   anxiety. A.R. 550, 551, 553. While this indicates that McGarrah experienced some improvement

17   with medication, "[r]eports of 'improvement' in the context of mental health issues must be

18   interpreted with an understanding of the patient's overall well-being and the nature of her

19   symptoms." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). "They must also be

20   interpreted with an awareness that improved functioning while being treated and while limiting

21   environmental stressors does not always mean that a claimant can function effectively in a

22   workplace." *Id*. The Ninth Circuit has cautioned that it is "error for an ALJ to pick out a few

23   isolated instances of improvement over a period of months or years and to treat them as a basis for

24   concluding a claimant is capable of working." *Id*. It is not clear, and the ALJ did not explain,

25   how a three-month period of improvement in McGarrah's mental health symptoms provided a

26   basis to discount the opinion of a treatment provider over two years later.[2]

27   _____

28   [2] The court also notes that McGarrah resumed taking medication for her conditions, including
     Ativan and Effexor, in 2015, and her partner testified that she consistently took her medication.

Finally, although the ALJ wrote that McGarrah's "activities contradict" the opinion, she did not connect any specific activities that McGarrah is capable of performing to the Jones/Franklin opinion or otherwise explain how McGarrah's activities support giving the opinion less weight. In fact, the opinion notes that McGarrah came to all of her therapy appointments "with an escort," and that when she tried to come to an appointment by herself, she had a "meltdown," or anxiety attack, on public transportation. A.R. 657.

In sum, the court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount the Jones/Franklin opinion.

### ii. Saini/Der Bing Opinion

The ALJ first discounted the Saini/Der Bing opinion as based on McGarrah's subjective reporting, and wrote that the marked and extreme limitations "are advocatory in nature, as they are not supported by the record." A.R. 29. This is not a specific and legitimate reason to discount the opinion, because it ignores the actual observations of McGarrah by Drs. Saini and Der Bing in the opinion itself, wholly unrelated to her reporting. These include McGarrah's low grooming and hygiene, poor eye contact, incoherent speech, passive cooperation, anxious mood, depression, irritability, and psychomotor retardation. A.R. 658. Further, there are numerous clinical observations of McGarrah in Drs. Saini and Der Bing's treatment notes, which reflect approximately 17 therapy sessions with Dr. Der Bing and five office visits with Dr. Saini over a six-month period. A.R. 735-806; *see, e.g.*, A.R. 765 (Saini: McGarrah "seemed to be very guarded, irritable and sad. Affect was varying between sad, blunt, angry, irritable and frustrated."); 766 (Der Bing: "Initially, many tears were shed uncontrollably when talking about emotions in general"); 783 (Der Bing: "She initially presented as tense, often picking her [forehead] in scalp"). To the extent that the ALJ intended to suggest that the Saini/Der Bing opinion was entitled to less weight because McGarrah's own reporting to her psychologist and psychiatrist was not credible, there is nothing in the opinion or those providers' treatment notes that indicates McGarrah's lack of credibility. As with the Jones/Franklin opinion, discussed

---

A.R. 51, 62, 595, 600.

above, Drs. Saini and Der Bing opined that McGarrah is not a malingerer. A.R. 658.

The ALJ also reasoned that the limitations found by Saini and Der Bing were "advocatory in nature, as they are not supported by the record." A.R. 29. For the same reasons discussed above, the court concludes that this is not a sufficiently "specific and legitimate reason" to assign less weight to the Saini/Der Bing opinion. The Saini/Der Bing opinion was consistent with the opinions of Jones and Dr. Franklin and the limitations assessed by Childs and Dr. Franklin.

Next, the ALJ wrote that the record did not document any episode of decompensation of at least two weeks duration. As with the Jones/Franklin opinion, the ALJ did not provide any explanation of how this reason undermined the Saini/Der Bing opinion. It is not a specific and legitimate reason supported by substantial evidence to discount that opinion.

Finally, the ALJ offered two additional reasons to discount the Saini/Der Bing opinion. She wrote that "prior mental health treatment notes demonstrate significantly improved functioning with mental health" and that McGarrah's activities contradicted the opinion. A.R. 29. As discussed above, the ALJ did not cite any evidence in particular to support these reasons. To the extent she intended to rely on a 2012 period of improvement in McGarrah's symptoms with medication, the ALJ did not explain how this provided a basis to discount the opinion of McGarrah's treating physicians over two years later. As to McGarrah's activities, the ALJ did not connect any specific activities that McGarrah is capable of performing to the Saini/Der Bing opinion or otherwise explain how McGarrah's activities support giving the opinion less weight.

The court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount the Saini/Der Bing opinion.

### iii. Childs/Franklin Opinion

The ALJ offered eight reasons to discount the Childs/Franklin opinion. First, she wrote that the opinion was based on McGarrah's subjective reporting, and that the marked and extreme limitations "are advocatory in nature, as they are not supported by the record." A.R. 29. This reason is plainly contradicted by the opinion itself. In addition to a clinical interview of McGarrah, the Childs/Franklin opinion was based on a review of treatment records from three sources and a series of objective tests assessing McGarrah's overall intellectual functioning,

19

United States District Court
Northern District of California

neuropsychological functioning, language, visuospatial/constructional abilities, memory, attention and concentration, executive functioning, and emotional functioning. A.R. 561-566. The ALJ also wrote that the limitations found by Childs and Dr. Franklin were "advocatory in nature, as they are not supported by the record." A.R. 29. She did not otherwise explain this reason, and the court concludes that it is not a sufficiently "specific and legitimate reason" to assign less weight to the Childs/Franklin opinion. As noted above, these limitations were consistent with the opinions expressed by Drs. Saini and Der Bing and Dr. Franklin's later opinion with Jones.

The ALJ next wrote that the record did not document any episode of decompensation of at least two weeks duration. As with the opinions discussed above, the ALJ did not provide any explanation of how this reason undermined the Childs/Franklin opinion. It is not a specific and legitimate reason supported by substantial evidence to discount that opinion.

Next, the ALJ discounted the Childs/Franklin opinion on the basis that "Dr. Franklin did not examine the claimant during the April 2014 evaluation and the record lacks corresponding treatment notes." A.R. 29. She also wrote that "the April 2014 evaluation noted that the results of the MMSE indicated no impairment." A.R. 29. While it appears that Dr. Franklin did not examine McGarrah personally, she endorsed the evaluation performed by her supervisee, Childs. *See* A.R. 567. As to the lack of corresponding treatment notes, McGarrah was referred to Childs and Dr. Franklin for a consultative psychological evaluation. She was not a patient under Dr. Franklin's care at the time of the April 2014 evaluation, so it follows that there would be no corresponding treatment notes. These are not specific and legitimate reasons to discount the Childs/Franklin opinion.

As to the MMSE test results, the Childs/Franklin opinion states that "[t]he MMSE is a simple measure utilized to describe an individual's current mental status." A.R. 654. The opinion goes on to state that while "[p]atients with serious mental illnesses may not always present with impairments on this exam . . . [t]he MMSE does help us to screen for patients with more severe neuropsychological illnesses as a result of brain disease or physical trauma." A.R. 564. Based on this description of the test, it makes little sense to point to McGarrah's overall MMSE score of 29/30 and conclude that it "indicated no impairment," because McGarrah does not allege "more

serious neuropsychological illnesses as a result of brain disease or physical trauma." Moreover, focusing solely on the results of the MMSE ignores the results of the other tests administered by Childs which indicated significant impairments. *See* A.R. 563-564. These included McGarrah's scores on the Wechsler Abbreviated Scale of Intelligence, which showed that her "intellectual functioning falls within the Well Below Average range" and the Repeatable Battery for Assessment of Neuropsychological Status, which "placed her in the 0.1 percentile and in the Extremely Low range." A.R. 564-565.

The ALJ next wrote that Dr. DeBattista noted that McGarrah "had average intelligence and her education and work history are inconsistent with the diagnosis of borderline intellectual functioning," and that "alcohol abuse and marijuana abuse are not noted in the diagnostic impressions of the April 2014 evaluation." A.R. 29. The ALJ was correct in noting that Dr. DeBattista reached a different conclusion about McGarrah's intelligence than Childs and Dr. Franklin, but the ALJ did not explain the purported inconsistency between Childs and Dr. Franklin's finding and McGarrah's education and work history. While McGarrah completed high school, she last worked in 2007, seven years before undergoing the tests at issue. *See* A.R. 229. Further, the Childs/Franklin opinion does not ignore McGarrah's use of alcohol and marijuana, as the ALJ suggests; the opinion addresses McGarrah's binge drinking and use of marijuana, as well as her previous diagnoses of alcohol abuse and cannabis dependence. A.R. 562.

The final two reasons the ALJ gave for discounting the Childs/Franklin opinion were that "prior mental health treatment notes demonstrate significantly improved functioning with mental health" and that McGarrah's activities contradicted the opinion. A.R. 29. As discussed above in connection with the Jones/Franklin and Saini/Der Bing opinions, the ALJ did not cite any evidence in particular to support these reasons. She did not explain how any improvement by McGarrah provided a basis to discount the Childs/Franklin opinion, and did not connect any specific activities that McGarrah is capable of performing to the opinion or otherwise explain how McGarrah's activities support giving the opinion less weight.

In sum, the court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence to discount the Childs/Franklin opinion.

### b. Examining Physician Dr. Wiebe

Dr. Wiebe performed a consultative psychological evaluation of McGarrah in July 2015. She opined that McGarrah has a number of extreme and marked impairments in several areas. The ALJ listed five reasons supporting her decision to give Dr. Wiebe's opinion little weight. A.R. 28. As Dr. Wiebe's opinion contradicted the opinions of Dr. DeBattista and the state agency medical consultants, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject Dr. Wiebe's opinion. *Lester*, 81 F.3d at 830.

First, the ALJ wrote that Dr. Wiebe's opinion was based on McGarrah's subjective reporting, and that McGarrah "is an unreliable historian." A.R. 28. This is not a "specific and legitimate reason" to reject Dr. Wiebe's opinion, because it inaccurately characterizes that opinion. Dr. Wiebe's opinion was not solely based on an interview of McGarrah. Dr. Wiebe also administered multiple tests and reviewed records from seven sources. A.R. 682. Next, the ALJ wrote that Dr. Wiebe noted that McGarrah had been homeless for 10 years, and that her opinion was "advocatory in nature, as she characterized the claimant's alcohol use disorder as mild and made no mention of her daily marijuana use." A.R. 28. These descriptions of Dr. Wiebe's statements are at best incomplete. In fact, Dr. Wiebe wrote that McGarrah had recently moved to an apartment with her partner and roommates, and that prior to the move "she had been homeless and staying [with] people, for 10 years." A.R. 678. Further, while Dr. Wiebe characterized McGarrah's alcohol use disorder as mild, A.R. 690, she discussed her alcohol use at length in the opinion, A.R. 681, 688-689, and discussed McGarrah's report that "she has a prescription for marijuana which she uses daily for anxiety." A.R. 679.

Finally, the ALJ discounted Dr. Wiebe's opinion on the grounds that "mental health treatment notes from 2012-2013 demonstrate that claimant had improved functioning with mental health treatment," and that McGarrah's activities contradicted the opinion. A.R. 28. As discussed above in connection with the Jones/Franklin, Saini/Der Bing, and Childs/Franklin opinions, the ALJ did not cite any evidence in particular to support these reasons. She did not explain how any improvement by McGarrah provided a basis to discount Dr. Wiebe's opinion, and did not connect any specific activities that McGarrah is capable of performing to the opinion or otherwise explain

how McGarrah's activities support giving the opinion less weight.

The court concludes that the ALJ erred with respect to the opinion of Dr. Wiebe.

**B.       McGarrah's Credibility Assessment**

McGarrah next challenges the ALJ's determination that she was not credible.  The ALJ found that McGarrah's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [McGarrah's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  A.R. 25.

The ALJ identified several reasons for rejecting McGarrah's testimony.  First, the ALJ found McGarrah not fully credible based on the fact that the record contained only "intermittent mental health treatment notes," and that McGarrah had experienced improvement in 2012 and 2013 after she started therapy and psychotropic medication but then stopped following up with treatment and stopped taking prescribed medication in 2013.  A.R. 27.  She also noted that the referrals to psychological evaluations and the majority of the mental health progress notes were dated after the acknowledgment of McGarrah's request for a hearing, "which suggest that her treatment and referrals were obtained for the purpose of the disability claim."  A.R. 27.  She also wrote that there were inconsistencies in the record that indicated that McGarrah was an unreliable historian, and that McGarrah's activities indicated a higher level of functioning than she claimed.  A.R. 27-28.  Since critical parts of these issues are tied to the ALJ's evaluation of the medical evidence, about which the court has already found error, the court refrains from analyzing the ALJ's credibility finding at this time.  Under these circumstances, it makes sense on remand for the ALJ to reevaluate the credibility determination upon reevaluation of the medical evidence.

//

//

//

//

//

//

United States District Court
Northern District of California

## VII. CONCLUSION

For the foregoing reasons, the court grants in part McGarrah's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

**IT IS SO ORDERED.**

Dated: September 4, 2018



Donna M. Ryu
United States Magistrate Judge